JS6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1370 | **DATE** | 8/4/2004 |
| **CASE TITLE** | Sharon D. Richardson vs. Chicago Transit Authority | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
       ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. In the absence of any evidence probative of race-bases or sex-based discrimination, no reasonable jury could rule in Richardson's favor. Because there is thus no genuine issue of material fact, CTA is entitled to a judgment as a matter of law. Its Rule 56 motion is therefore granted (14-1), and this action is dismissed. Defendant's motion to strike is denied as moot.(24-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | AUG 0 9 2004 | |
| | Notices mailed by judge's staff. | | date docketed | 27 |
| | Notified counsel by telephone. | | JXM | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | | |
| | Copy to judge/magistrate judge. | CLERK | date mailed notice | |
| SN | courtroom deputy's initials | 2004 AUG -5 AM 8:9 | mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SHARON D. RICHARDSON,            )
                                 )
            Plaintiff,           )
                                 )
       v.                        )   No. 03 C 1370
                                 )
CHICAGO TRANSIT AUTHORITY,       )
                                 )
            Defendant.           )

DOCKETED
AUG - 9 2004

MEMORANDUM OPINION AND ORDER

After she was terminated from her job as the Chicago Transit Authority ("CTA") Manager of Customer Relations, Sharon Richardson ("Richardson") sued CTA, alleging that it had discriminated against her on account of her race and sex in violation of both Title VII of the Civil Rights Act ("Title VII," 42 U.S.C. §2000e) and 42 U.S.C. §1981 ("Section 1981"). CTA moved for summary judgment pursuant to Fed. R. Civ. P. ("Rule") 56, and both parties have complied with this District Court's LR 56.1.[1]

Even with the record viewed in her favor as Rule 56 requires, Richardson has not come forward with enough facts for a

---

[1] LR 56.1 requires parties to submit evidentiary statements, and responses to such statements, to highlight which facts are disputed and which facts are agreed upon. This opinion cites to CTA's LR 56.1 statement as "C. St. ¶--," to Richardson's LR 56.1 statement as "R. St. ¶--" and to their respective responses as "C. Resp. ¶--" and "R. Resp. ¶--." Where either party's LR 56.1 statement is undisputed by the opponent, the opinion includes only a citation to the original statement. Memoranda and documents submitted by the parties are also identified by those same "C." and "R." designations.

reasonable jury to conclude that she ought to prevail on either ground of her Title VII claim or on her Section 1981 claim. Hence CTA's Rule 56 motion is granted, and this action is dismissed.

## Rule 56 Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, (477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows is therefore a summary of the facts viewed in the light most favorable to nonmovant Richardson--but within the limitations created by the extent of her compliance (or noncompliance) with the strictures of LR 56.1.

Facts

Richardson was hired in October 1997 as CTA's Manager of Customer Relations (C. St. ¶13). Her chief responsibility was to manage the day-to-day operations of CTA's call center, including supervising its staff (R. St. ¶2; R. Ex. A).

In May 2000 Richardson took over as Acting General Manager of Customer Relations (R. St. ¶13), reporting directly to CTA's Vice President of Transit Operations Richard Winston ("Winston") (C. St. ¶15). Richardson held that job for a little over a year until CTA hired Tamara McCollum ("McCollum") in August 2001 as the permanent General Manager (C. St. ¶18). At that point Richardson returned to her previous post as Manager of Customer Relations (C. St. ¶20).

As McCollum began her tenure with CTA, Richardson helped to transition her new supervisor into the position she herself had been filling (R. St. ¶45). But despite their initially cordial interaction, over the course of the next several months McCollum and Richardson developed a volatile working relationship that vacillated from harmony to acrimony.

For example, Richardson openly told McCollum that she believed McCollum was micromanaging the department and that her management style was ineffective (C. St. ¶¶68-70). But at other times Richardson also said that she appreciated McCollum's openness and honesty and that she enjoyed working with McCollum

3

because of her love for customer service (C. St. ¶75).

McCollum was more consistent in the messages she sent to Richardson. Indeed Richardson herself thought that she could never please McCollum (C. St. ¶66; R. Dep. 118):

> I didn't receive anything from her but negativity. Everything was always negative. Something was always wrong. Something didn't get done to her expectations.

In one instance McCollum told Richardson she was concerned that Richardson managed more by emotion than by reasoned judgment (C. St. ¶51). On another occasion she informed Richardson that she was not meeting the deadlines that were required of her (C. St. ¶49). Yet when McCollum was out of the office she entrusted Richardson with handling any matters that might crop up in her absence (R. St. ¶¶50-51).

Beginning in 1999 CTA implemented a new model for employee evaluations (R. St. ¶4). That system used a five-point scale to assess each employee's performance annually (R. Ex. C):

| | |
|---|---|
| 5=Outstanding | Individual is a truly exceptional performance [sic], substantially exceeding requirements in all major responsibilities and/or goals. |
| 4=Exceeds Expectations | Individual consistently meets performance standards and exceeds requirements in many aspects of the job. |
| 3=Meets Expectations | Individual has performed a complete and fully satisfactory job and has met major responsibilities and/or goals in a competent manner. |
| 2=Needs Improvement | Individual meets minimal performance standards, but has room for |

|                    | improvements. Also applies to new employees who may need additional training or experience. |
|---|---|
| 1=Unsatisfactory   | Individual exhibits unsatisfactory performance. Substantial improvement is required to continue in position. |

Richardson received three evaluations under the new system. Executive Vice President Jack Hartman ("Hartman") rated her work as 2.5 for 1999, and Winston assessed her work as 2.3 for 2000 (C. St. ¶¶31, 35). Richardson's final performance evaluation was completed by McCollum, who rated Richardson's work as 1.72 for the period from August to December 2001 (R. Resp. ¶93; R. Ex. F; C. R. Mem. 2 n.2)

On March 8, 2002--based on a recommendation from McCollum--Richardson was suspended from active duty and was immediately escorted off the premises (C. St. ¶100; C. Resp. ¶75). When Richardson returned the following week she received a "Notice of Discharge" (signed by Winston) that cited several reasons for that termination decision: Richardson's failure to obey rules; her abuse of company time and poor work performance; and her general failure to use her best judgment when handling situations that had arisen throughout the course of her employment (C. St. ¶¶12, 124).

After she was thus fired, Richardson filed a charge with EEOC, claiming that her suspension and termination constituted race-based and sex-based discrimination. After EEOC then issued

a right to sue letter, Richardson filed this action (C. St. ¶9).

## Richardson's Proof--or Absence of Proof

In the absence of anything even remotely resembling the proverbial "smoking gun," Richardson resorts to the familiar burden-shifting model originally outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) in her attempt to avoid summary judgment.[2] That approach first requires Richardson to create a prima facie case by coming forward with evidence sufficient for a reasonable jury to infer discrimination (Johnson v. Nordstrom, Inc., 260 F.3d 727, 731 (7th Cir. 2001). If Richardson can succeed in that task as to discrimination based on either her race or her sex, the McDonnell Douglas model then requires CTA to articulate a legitimate nondiscriminatory reason for its conduct (id. at 731-32). If CTA does so, Richardson must adduce enough evidence for a reasonable jury to conclude that CTA's asserted justification was merely a pretext for discrimination--that it was actually motivated (at least in part) by animus against Richardson as an African-American or as a woman or both (id. at 732).

At the prima facie stage, one common formulation requires Richardson to raise an inference of discrimination by showing

---

[2] Because both parties properly use the same analysis to evaluate CTA's liability under both Title VII and Section 1981, this opinion likewise does not distinguish between the two statutes in addressing Richardson's discrimination claims (see Cerutti v. BASF Corp., 349 F.3d 1055, 1060-61 (7th Cir. 2003)).

6

that (1) she is a member of a protected class, (2) she was performing her job reasonably according to CTA's legitimate expectations, (3) she suffered an adverse employment action and (4) at least one similarly situated employee not in her protected class was treated more favorably (see, e.g., Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 978 (7th Cir. 2004); Haywood v. Lucent Tech., Inc., 323 F.3d 524, 531 (7th Cir. 2003)). But that formulation is not carved in stone (Leffel v. Valley Fin. Servs., 113 F.3d 787, 793 (7th Cir. 1997); see also Marla Swartz, "The Replacement Dilemma: An Argument for Eliminating a Non-Class Replacement Requirement in the Prima Facie Stage of Title VII Individual Disparate Treatment Discrimination Claims," 101 Mich. L. Rev. 1338, 1352-57, 1360 (2003)(hereafter "Swartz").[3] Because the sole purpose of the first McDonnell Douglas step is to create an inference of discrimination (Leffel, 113 F.3d at 792), the earlier-stated four-factor test is only one way to reach that goal. Instead Richardson could clear that hurdle by producing any evidence from which a reasonable jury could logically infer

---

[3] This opinion's references to the Swartz student note are scarcely accidental: Its author is this Court's extraordinarily able law clerk, who is fast approaching the end of her clerkship term. In this case, as always, Ms. Swartz produced a draft opinion reflecting thoughtful analysis and comprehensive research--invaluable input toward this final product. If any errors have nonetheless found their way into this opinion, they are to be placed at this Court's doorstep and not Ms. Swartz's, for this Court (again as always) has left its mark on the review and revision of each sentence, as well as having read each of the cited cases.

7

discrimination (see Carson v. Bethlehem Steel Corp., 82 F.3d 157, 158-59 (7th Cir. 1986)(per curiam)). In this instance she simply has not done so.

True enough, Richardson is both African-American and a woman (R. St. ¶1). And of course CTA's conduct in suspending and eventually terminating her employment were adverse employment actions (C. Mem. 11). But not even a shred of evidence links those elements with a potential finding of discrimination, even with the benefit of the most favorable inferences.

In her effort to support such an inference, Richardson first asserts that she was meeting CTA's legitimate expectations. But as the ensuing discussion demonstrates, CTA proffers an avalanche of evidence that torpedoes any such contention.

Although Winston ultimately authorized Richardson's termination, McCollum was the CTA representative who had directly supervised her on a day-to-day basis before that dismissal (C. St. ¶24). It is therefore McCollum's evaluations and impressions and her potential (or actual) discriminatory biases that are most relevant in determining whether Richardson can raise an inference of discrimination (Schreiner v. Caterpillar, Inc., 250 F.3d 1096, 1100 (7th Cir. 2001)).[4]

---

[4] While McCollum's own status as an African-American woman does not of course foreclose Richardson's discrimination claims, it is relevant evidence that a jury could use in making a liability determination (cf. Herrnreiter v. Chicago Hous. Auth., 315 F.3d 742, 747 (7th Cir. 2002)). But at the summary judgment

Richardson's final performance evaluation (completed by McCollum) includes many scathing remarks about Richardson's performance and is the most comprehensive articulation of all McCollum's concerns (C. St. ¶93; R. Ex. F). McCollum said there that as a manager Richardson was a "major source of tension within the work group." She observed that Richardson had difficulty evaluating various situations and often made decisions based on emotion instead of facts. She concluded that as a result of those managerial shortcomings many members of Richardson's staff were hesitant to discuss issues with her--a problem that increased the workload of other managers who were left to deal with the fallout. McCollum went on to comment that Richardson did not herself respond well to feedback or adequately accept responsibility for the problems in her department. Generally McCollum concluded that Richardson did "not exhibit the required skill set necessary to be an effective manager" and did "not consistently display professionalism nor model behavior that is expected of a manager."[5] Little wonder, then, that McCollum's overall evaluation found Richardson to fall far short of even the marginal "meets the minimal performance standards" benchmark.

Much of that criticism focuses on Richardson's interpersonal

---

stage it cannot enter into the analysis.

[5] Those comments, though representative, are only a part of the criticism that McCollum included in Richardson's 2001 evaluation (R. Ex. F).

skills and management techniques, rather than on particularized instances of flawed performance. But an employee's competence is not measured solely by how well she performs specific articulated duties of her job (see Oates v. Discovery Zone, 116 F.3d 1161, 1171 (7th Cir. 1997)). And that is even more true of a manager, as to whom those more intangible qualities are the key to what makes managers excel or fail to excel in their roles.

In response Richardson contends that despite McCollum's evaluation she has still adduced enough evidence for a reasonable jury to conclude that she was meeting CTA's legitimate business expectations (R. Mem. 10-12). That is simply not so.

First, Richardson's own testimony that she was meeting CTA's legitimate business expectations cannot itself raise a genuine issue of material fact on that score--especially in the face of CTA's voluminous evidence to the contrary (Mills v. First Fed. Sav. & Loan Ass'n of Belvidere, 83 F.3d 833, 843-44 (7th Cir. 1996)). To hold otherwise would essentially eviscerate the legitimate-expectations prong of the prima facie case (Oates, 116 F.3d at 1172).

Equally flimsy is the documentary evidence that Richardson believes contradicts CTA's evidence. Richardson relies primarily on an evaluation by Winston, which led to her temporary promotion to Acting General Manager of Customer Relations in 2000, to contend that she was meeting CTA's legitimate business

10

expectations (R. St. ¶¶20-27; C. Resp. ¶20). But even apart from the fact that a current evaluation rather than an earlier one tells whether Richardson was performing up to CTA's expectations at the time of her dismissal (Karazanos v. Navistar Int'l Transp. Corp., 948 F.2d 332, 336 (7th Cir. 1991)), it will be remembered that even for the year 2000 the overall 2.3 evaluation given her by the selfsame Winston was that she did not "meet expectations"--far below the "3" level that would denote that level of performance. Clearly Richardson's evidence does not provide a basis for a reasonable jury to conclude that she was meeting CTA's legitimate business expectations.

Despite her having failed on that score, Richardson might still be able to dodge summary judgment by showing that she was disciplined more harshly than other similarly situated employees who were not African-American or women--even if a reasonable jury viewed her performance (like theirs) as unsatisfactory (Flores v. Preferred Tech. Group, 182 F.3d 512, 515 (7th Cir. 1999)). But here Richardson cannot meet even that lesser requirement, because each of her two attempts to compare herself to a white male-- Manager of Budget Oversight Byron Yehling ("Yehling") and Supervisor of Customer Service Tom Marasovich ("Marasovich")--is wholly unsuccessful (R. St. ¶80; C. St. ¶127).[6]

---

[6] CTA also discusses Charles Lindenmuth ("Lindenmuth") and Daniel Schurz ("Schurz") as potentially similarly situated to Richardson (C. St. ¶¶131-34, 138-40; C. Mem 11-13). But because

11

Two individuals are similarly situated in the discriminatory discipline context if both "dealt with the same supervisor, were subject to the same workplace rules, and engaged in similar conduct" (Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 940 (7th Cir. 2003)). It takes only a brief side-by-side look to see that Richardson strikes out as to each of the two asserted comparables.

First, as to Yehling, while Richardson's supervisor was McCollum, Yehling reported to Dennis Milicevic (C. St. ¶135). That alone could well scratch Yehling off of the similarly-situated list (Radue v. Kimberly-Clark Corp., 219 F.3d 612, 618 (7th Cir. 2000)). But even if this Court were to consider the more attenuated "connection" of Richardson and Yehling based on each of them having been evaluated by Winston at some point (Richardson in 2000 and Yehling in 1999)(C. St. ¶35; R. Ex. I),[7] Richardson's effort at comparison is further doomed by the absence of any indication that Yehling's performance was anywhere near as consistently poor as Richardson's. While they may have

---

Richardson does not mention Lindenmuth or Schurz in her Response (R. Mem. 7), she has forfeited any argument as to whether either of them was sufficiently similarly situated to her to warrant comparison or as to whether, upon comparison, either was actually treated more favorably than she was (cf. e.g., Cooper v. Lane, 969 F.2d 368, 371 (7th Cir. 1992)).

[7] In that respect the far lesser probative value of evaluations substantially earlier than the time of termination, already noted in another context, again bears mention.

12

started with similarly unsatisfactory performance evaluations, over the course of three years Yehling's evaluation score steadily improved from 2.26 to 3.32 while Richardson's went in the opposite direction: from 2.5 to 1.72 (C. St. ¶¶31, 35, 93; R. Ex. I-K). At the relevant moment of comparison--just before Richardson's termination--Yehling was outperforming Richardson dramatically (Karazanos, 948 F.2d at 336).[8]

Richardson fares no better vis-a-vis Marasovich. First, the two had different supervisors: Marasovich was supervised not by McCollum but by Richardson herself (C. St. ¶127). Moreover, the conduct of the two employees does not match up at all. While Richardson exhibited a whole slew of problems documented in her performance evaluations, she has not produced any evidence about how Marasovich fared on any of his evaluations. Instead her only evidence about Marasovich's conduct indicates that any brief performance problems Marasovich may have exhibited in the past were quickly addressed by transferring him to a more suitable environment than the call center (C. St. ¶¶84-86, 129).[9]

---

[8] Nor does Richardson's otherwise unsupported affidavit assertion that Yehling missed deadlines when he managed a project monitored by a committee on which Richardson sat add anything to the relevant mix. It is CTA's perception of Yehling's conduct that controls a determination that he was or was not meeting CTA's expectations--not the views of other employees (or, a fortiori, of Richardson herself)(R. St. ¶¶81-82; see Koski v. Standex Int'l Corp., 307 F.3d 672, 677 (7th Cir. 2002)).

[9] Ironically, when Marasovich was having performance difficulties McCollum considered terminating his employment, but

Along another line (although never quite fully explained), Richardson appears to argue that it was incumbent on CTA to discipline her according to its Corrective Action Guidelines ("Guidelines") and that its failure to do so raises enough of an inference of discrimination to sustain her prima facie case (R. Aff. ¶4; R. Ex. B). With Richardson having failed to develop that contention in any meaningful way, it is not this Court's responsibility to do so for her. It has nonetheless considered the matter and finds the argument empty as well (among numerous other reasons, because of the total absence of any comparable employees who received disparate treatment).

In sum, Richardson is plainly unable to create her prima facie case via the conventional four-factor test. Perhaps recognizing (though not admitting) that, she also ventures on a few different tacks in her attempt to raise an inference of discrimination.

Richardson first contends that at least as to her sex discrimination claim, she need not satisfy the similarly-situated aspect of her case because she was replaced by a man (parenthetically, also African-American) (R. Mem. 10). That is

---

Richardson lobbied for the more lenient transfer solution (C. St. ¶¶81-82). Even if Marasovich and Richardson were to be viewed as similarly situated, then, only Richardson's intervention on his behalf spared Marasovich from exactly the same disciplinary action that Richardson received--McCollum's handling of the two employees would have been entirely consistent.

14

just plain wrong. While the fact of such replacement could potentially help raise an inference of sex discrimination under some circumstances, it is "neither a sufficient nor a necessary condition" to Richardson's prima facie case and--absent other probative evidence--does not really advance the ball toward her goal (C. St. ¶125; Carson, 82 F.3d at 159; Swartz, 1338 Mich. L. Rev. at 1346-47).

Lastly, Richardson asserts that CTA's decision to escort her off of the CTA premises immediately following her suspension is evidence of sex discrimination sufficient to maintain her prima facie case (R. Resp. ¶107; C. St. ¶112). But it is a real non sequitur to suggest that such conduct on CTA's part (at least without meaningful further linkage) plausibly supports Richardson's discrimination claim.

All in all, Richardson's effort to ascribe everything of an unfavorable nature that she has endured to the fact that she is African-American or a woman or both is a classic demonstration of Alexander Pope's famous aphorism:[10]

> All seems infected that th' infected spy,
> As all looks yellow to the jaundic'd eye.

There is no question that Richardson and McCollum had a highly contentious working relationship characterized by negative interactions and almost daily personality conflicts. But this

---

[10] Essay on Criticism, pt. 2, line 358.

case is not about whether McCollum was a good manager or a terrible manager, or whether she was helpful or hostile to her subordinates, or even whether she liked or didn't like Richardson. What Richardson appears to have forgotten (or more likely would have this Court forget) is that this case is only about whether CTA (as evidenced by the actions of McCollum or any other CTA actor) discriminated against Richardson on account of her race or sex when it made the decision to terminate her.[11]

Because Richardson has fallen at the threshold hurdle of the prima facie case, there is no occasion to continue with the <u>McDonnell Douglas</u> burden-shifting analysis (<u>Cerutti</u>, 349 F.3d at 1061). Nonetheless it is worth noting briefly that CTA has proffered a patently legitimate reason for its decision to terminate Richardson--her abundant shortcomings in the performance of her job duties, as best evidenced by her deteriorating performance evaluations (C. St. ¶93; C. Mem. 14). And Richardson has not even hinted at why or how that reason is unworthy of credence or at how CTA's decision was motivated by discrimination (<u>Nawrot v. CPC Int'l</u>, 277 F.3d 896, 905-06 (7th Cir. 2002)).

---

[11] Arguments such as those advanced by Richardson account for the regular repetition of the now-trite maxim that courts do not sit as superpersonnel departments to adjudicate the intrinsic fairness or wisdom of nondiscriminatory employment decisions (<u>Stewart v. Henderson</u>, 207 F.3d 374, 378 (7th Cir. 2000)).

## Conclusion

In the absence of any evidence probative of race-based or sex-based discrimination, no reasonable jury could rule in Richardson's favor. Because there is thus no genuine issue of material fact, CTA is entitled to a judgment as a matter of law. Its Rule 56 motion is therefore granted, and this action is dismissed.[12]

_____
Milton I. Shadur
Senior United States District Judge

Date: August 4, 2004

---

[12] Under the circumstances there is no need to address the particulars of CTA's July 13, 2004 Motion To Strike Portions of Plaintiff's Documents in Response to Defendant's Motion for Summary Judgment. Because this opinion has taken account of all of Richardson's submissions that conform to the requirements of Rule 56(e) and LR 56.1 and has found them wanting in substantive terms, that motion can be--and is--denied as moot.